## WALSH et al. v. TWEEDIE TRADING CO.

### THE HERM.

(District Court, S. D. New York. February 28, 1907.)

SHIPPING—CHARTER PARTY—OPTIONAL EMPLOYMENT OF VESSEL.

A charter for a steamship was for a voyage to the west coast of South America and return, but gave the charterer an option to employ the vessel in general trade for a period of about three months, but not exceeding five months. After, employing the vessel between ports of the United States, the West Indies, and eastern South America for between two and three months, the charterer proposed to send her to the west coast of South America, and offered an increased hire, but the owners refused. Such voyage would have involved a considerable extension of time in excess of five months. *Held*, that the charterer had used the vessel under the option for general trading, and was not then entitled to make the west coast voyage under the charter without a further agreement for the additional time.

In Admiralty.

Convers & Kirlin and Russell T. Mount, for Walsh and others. Wheeler, Cortis & Haight, for Tweedie Trading Company.

ADAMS, District Judge. The first of the above actions, William S. Walsh, et al., agents for owners, against the Tweedie Trading Company, was brought to recover from the latter, a balance of hire of the steamship Herm under charter dated New York, June 21, 1905. She went into service July 12th, 1905. The claim was for hire from November 3rd, 1905 to December 20th, 1905, at the rate of £1100 per month and from December 20th to January 4th, 1906, at the rate of £1500 per month. The total hire claimed was $9,573.64. Credits were allowed by reason of payments and other matters to the extent of $6,233.99, leaving a balance of hire due of $3,339.65, for which this action was brought.

It was alleged in the answer, with other things not necessary to consider here, that the libellants were not entitled to recover the said hire because they refused to send the steamer to the west coast of South America in accordance with the charterer's demand. The claim is set forth more in detail in the cross libel, the second action, wherein it was alleged:

"Fourth. Thereafter the steamship Herm was delivered to the libellant and in accordance with the provisions of the charter party aforementioned, the libellant notified the respondent that it was considering sending said steamship to the west coast of South America. Thereupon the respondent, in violation of the terms of the charter party, notified the libellant that it would not allow said steamship to proceed to the west coast of South America. By reason of the premises, and because no cargo could be received in Brazil, where the said steamship then was, the libellant was forced to bring her back from Brazil in ballast, to its damage in the sum of $7,500, and it also sustained other damages which, as nearly as can be estimated at present, amounts to

$20,000. Prior to said refusal by the respondent, the libellant had paid to the respondent under said charter party, the sum of $1,311.82 as hire, which sum has not been earned by reason of the premises."

The charter party provided, inter alia, as follows:

"Witnesseth, That the said owners agree to let, and the said charterers agree to hire the said steamship from the time of delivery, for one round trip to West Coast of South America * * * to be employed in carrying lawful merchandise, * * * between safe port and or ports in British North America, and or United States of America, and or West Indies, and or Central America, and or Carribbean Sea, and or Gulf of Mexico, and or South America, and or Europe, and or Africa, and or Asia, and or Australia, excluding River St. Lawrence from October 1st to May 1st (White Sea, Black Sea, and the Baltic out of season), Magdalena River, and all unsafe ports; as the Charterers or their Agents shall direct, on the following conditions:"

   *     *     *     *     *     *     *     *     *     *

"Charterers have the option of employing the steamer in general trade for the period of about three (3) months, up to five (5) months, but in any event time not to exceed 5 months, subject of course to stranding, sinking, stress of weather or other accidents."

The latter clause was added at the foot of the instrument in type-writing.

It has been agreed that the Herm was delivered to the charterer at New York on the 12th of July, 1905; she finished loading her New York cargo July 19th; sailed for Fernandina July 20th; arrived at Fernandina July 23rd; loaded at Fernandina and sailed July 30th for Pernambuco; arrived at Pernambuco August 18th; completed discharge of cargo intended for Pernambuco and sailed August 24th for Rio; arrived at Rio August 29th, completed discharge there of the Rio cargo September 13th and sailed the 14th for Santos; arrived at Santos the 15th and completed her discharge of cargo the 20th; she lay idle at Santos, with steam up ready to leave port at a moment's notice, until October 5th. She left Santos October 5th for Pernambuco, where she arrived the 6th; she left Pernambuco the 6th for Barbadoes stopping there practically only for orders; then proceeded on to New York, still in ballast, where she arrived November 1st, 1905. The loading in New York began November 2nd, was completed the 8th and she sailed for Baltimore on that day; she arrived in Baltimore the 10th and completed loading there the 24th; she sailed thence for Tampico November 25th, where she arrived December 6th; she completed her discharge there December 21st and sailed for Coatzacoalcos, where she arrived December 25th and completed her discharge the 31st; she sailed for Galveston the same day and arrived there for re-delivery January 4th, 1906.

When the steamer was at Santos, a dispute arose between the owners and the charterer with respect to the steamer's employment on the west coast, the charterer desiring an extension of time to enable it to make a voyage to the northern part of the coast, which the owners refused excepting upon a considerable advance in the rate of hire. No agreement being reached, the charterer ordered the steamer to New York and she was afterwards employed for a short time in making a trip to Tampico and Coatzacoalcos, thence to Galveston where she went out of the charterer's service.

This dispute arises entirely out of the provisions of the charter party above quoted. The vessel reached Santos in September. After discharging cargo there she remained idle for fifteen days until October 5th. During this time some cable correspondence took place as follows:

The charterer on the 3d of October, cabled to the owners:

"Herm will you allow 2 months continuation of present charter £100 extra per month failing this Tweedie considering West Coast South America voyage."

On the 4th of October the owners replied:

"Herm owners agree to not exceeding 2 months continuation £200 extra per month whole period present charter and continuation difference failing this they protest keeping Herm over 5 months as per charter party therefore West Coast South America voyage impossible."

The ship agents on the 5th of October cabled to the owners:

"SS 'Herm' charterers they reject your proposition no freight offering Santos-Rio Janeiro. West Coast voyage may occupy up to seven months from now. Charterers claim West Coast option is without time limit. As you say you will not allow over five months total from start, charterers have ordered ship to proceed in ballast to Louisberg seeking freight orders off Pernambuco. They have given us notice that they hold owners responsible. Can arrange it to satisfaction of all concerned if you can arrange ship to be redelivered to owners at Europe not later than January 31st, penalty—£500."

In reply to this the owners cabled:

"Herm Tweedie threats ineffective owners insist on fulfilment of charter party which is in any event time not to exceed 5 months."

On the same day, the respondent sent the steamer to Pernambuco, where she arrived October 6th. Stopping off Barbadoes, practically only for orders, she proceeded in ballast to New York where she arrived November 1st. By arrangement between the parties, without prejudice to their rights under the original contract, she did some further work for the charterer and was re-delivered to the owners at Galveston, January 4, 1906.

The charterer's claim is set forth in the 4th paragraph of the counterclaim, above quoted. Its points are: (1) The charter was primarily for a trip to the west coast; the alternative option was never exercised, and the charterer had a right to send the vessel to the west coast, and (2) the owners' refusal to send her to the west coast was an anticipatory breach of contract.

The owners claim (1) that the clause "but in any event not to exceed 5 months" is applicable to the entire contract and limits the round trip to the west coast option as well as to the general trading option; (2) that should this clause appear to the court as an ambiguity appearing on the face of the contract, it is clearly shown to have been understood as a general limitation, by the cable communications upon which the charter was framed; (3) that should it appear to the court that the 5 months' limitation applies only to the general trading clause, yet the libellants never refused to allow the steamer to proceed to the west coast, and it is therefore not guilty of the breach of contract claimed by the respondent.

The charterer contends also that the option was never declared nor resorted to by it and the whole matter is determinable under the first clause of the contract, providing for a round trip to the west coast, while the owners contend that the provision contained in the option clause "but in any event time not to exceed 5 months" was a general limitation of the entire charter.

It appears that a voyage to the west coast involved considerable time. A vessel of the capacity of this one would require 18 to 20 days to load at starting port and probably 30 for discharging; that would leave approximately 100 days for going and returning, a steaming distance one way of upwards of 10,000 miles. One of the witnesses said that it was practically impossible to make it within the limit, which seems to be true. It looks as though the charterer never really contemplated the west coast trip but intended that the steamer's time should be occupied in general trading, meaning to the eastern coast of South America, where its business was usually done. It seems that the charterer intended from the beginning to use the vessel in such trading and it was only when it found that businesss there would be slack, that it resorted to the west coast demand, for which it appeared an extension of time would be required. It then offered an advanced rate for an extended period but the owners demanded more than the charterer offered or was willing to pay and the vessel was sent north for re-delivery.

I find that the owners are entitled to their hire without any deduction, excepting $36.46 for a further allowance for bunker coal on arrival and $425.78 for disbursements made for the owners at Tampico.

There will be a decree for the libellants for $2,877.41, with interest. The cross-libel will be dismissed.